<p style="text-align:center; color:red;">CORRECTED</p>

# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 21-2341V

|  |  |
|---|---|
| JOHN SULLIVAN, | Chief Special Master Corcoran |
| Petitioner, | Filed: April 16, 2024 |
| v. | |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |

*Ronald Craig Homer, Conway, Homer, P.C., Boston, MA, for Petitioner.*

*Benjamin Patrick Warder, U.S. Department of Justice, Washington, DC, for Respondent.*

## RULING ON ENTITLEMENT[1]

On December 29, 2021, John Sullivan filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that he suffered a left shoulder injury related to vaccine administration ("SIRVA"), a defined Table injury, after receiving an influenza ("flu") vaccine on September 22, 2020. Petition at 1, ¶ 2. He further alleges that he "suffered the residual effects of his injury for more than six months after the administration of the flu vaccine." *Id.* at ¶ 9.

---

[1] Because this Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

The parties dispute Petitioner's success in establishing the pain onset needed for a Table SIRVA, and whether the "severity requirement" necessary for all Program claims is met. For the reasons discussed below, I find that Petitioner likely suffered the residual effects of his SIRVA for more than six months, the onset of Petitioner's left shoulder pain occurred within 48 hours of vaccination, and he has satisfied the other requirements of a compensable Table SIRVA injury. Petitioner is thus entitled to compensation under the Vaccine Act.

## I.      Relevant Procedural History

Approximately one month after filing the Petition, Mr. Sullivan filed two declarations[3] and some of the medical records required under the Vaccine Act. Exhibits 1-8, filed Jan. 28, 2022, ECF Nos. 6-7; *see* Section 11(c). Almost seven months later, he filed the remaining medical records, a third declaration, and a declaration from his ex-wife whom he was married to and living with at the time of his alleged injury.[4] Exhibits 9-13, filed July 14, 2022, ECF Nos. 13-14. On July 27, 2022, the case was activated and assigned to the "Special Processing Unit" (OSM's adjudicatory system for resolution of cases deemed likely to settle). ECF No. 17.

As instructed, Petitioner provided a demand and supporting documentation to Respondent in late May 2023. ECF No. 26. He also stated that he did not intend to provide additional evidence or briefing regarding the potential factual issues of onset and severity which were previously identified. *Id.*; *see* Status Report, file Mar. 20, 2023, ECF No. 22.

On November 8, 2023, Respondent filed his Rule 4(c) Report opposing compensation in this case. ECF No. 27. Emphasizing the mild symptoms noted at Petitioner's last appointment on March 11, 2021 (less than two weeks before the six-month severity mark), and his failure to mention any left shoulder symptoms at medical appointments thereafter, Respondent insists Petitioner has failed to provide sufficient evidence to satisfy the Vaccine Act's severity requirement. *Id.* at 6-8. Due to the almost three-month delay before seeking treatment and statements which he characterizes as vague, Respondent also argues that Petitioner has failed to provide preponderant evidence establishing he suffered left shoulder pain within 48 hours of vaccination. *Id.* at 8-9.

---

[3] These declarations were signed under penalty of perjury as required by 28 U.S.C.A. § 1746. Exhibits 7-8.

[4] Like the earlier filed declarations from Petitioner, these declarations were signed under penalty of perjury as required by 28 U.S.C.A. § 1746. Exhibits 12-13.

The matter is now ripe for adjudication.

## II.    Finding of Fact Regarding Onset and Duration

At issue is whether Petitioner's first symptom or manifestation of onset after vaccine administration (specifically pain) occurred within 48 hours as set forth in the Vaccine Injury Table and Qualifications and Aids to Interpretation ("QAI") for a Table SIRVA and whether Petitioner continued to suffer the residual effects of the SIRVA for more than six months. 42 C.F.R. § 100.3(a) XIV.B. (influenza vaccination); 42 C.F.R. § 100.3(c)(10)(ii) (required onset for pain listed in the QAI); Section 11(c)(1)(D)(i) (statutory six-month severity requirement).

### A.    Authority

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence.  The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. "Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Murphy v. Sec'y of Health & Hum. Servs.*, No. 90-882V, 1991 WL 74931, *4 (Fed. Cl. Spec. Mstr. April 25, 1991), quoted with approval in decision denying review, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed.Cir.1992)). And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The United States Court of Federal Claims has outlined four possible explanations for inconsistencies between contemporaneously created medical records and later

testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such fact testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8; *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

## B.    Analysis

I make the onset and severity findings after a complete review of the record to include all medical records, affidavits or declarations, and additional evidence filed. Specifically, I base the findings on the following evidence:

- Prior to vaccination, Petitioner suffered from skin cancer, benign lesions, asthma, high cholesterol, and common illnesses. Exhibit 2 at 27-66; Exhibit 4 at 5-13; Exhibit 5 at 5-8.

- On September 22, 2020, Petitioner received the flu vaccine intramuscularly in his left deltoid at a Rite Aid Pharmacy. Exhibit 1 at 3-4.

- Almost three months later, on December 10, 2020, Petitioner visited his primary care provider ("PCP"), complaining of dull and achy left shoulder pain that "stared [sic] about the same time" as his flu shot, and "ha[d] worsen[ed] in the last two months." Exhibit 2 at 13. Stating that the pain occurred when sleeping, lifting, and stretching his arm forwards and backwards, Petitioner reported that his pain seemed to be aggravated by lifting light weights at home. *Id.*

- At this visit, Petitioner also described "a rotator cuff injury years back when he had jumped from a cliff into the water which was resolved after a few months with conservative approach." Exhibit 2 at 13. Later medical records state this prior rotator cuff injury occurred in Petitioner's right shoulder. Exhibit 3 at 38.

- Observing full range of motion ("ROM"), but mild discomfort with internal and external rotation, the PCP opined Petitioner's "[s]ymptoms appear to be consistent with rotator cuff tendinopathy/tear." Exhibit 2 at 13. Petitioner was reluctant to pursue physical therapy ("PT") or an orthopedic referral, but agreed to a prednisone trial, as well as rest, heat, and ice. *Id.*

- On February 19, 2021, Petitioner returned to his PCP, reporting no improvement with the conservative treatment to date. Exhibit 2 at 10-11. He "state[d] that the pain is not debilitating but its [sic] not going away." *Id.* at 11. At this visit, the PCP also noticed tenderness with palpitation of the biceps area. *Id.* He provided Petitioner with an orthopedic referral. *Id.*

- Less than one month later, on March 11, 2021, Petitioner was seen by the orthopedist. Exhibit 3 at 4-5, 37-44. After again describing his pain as "start[ing] after a flu shot about six months ago," Petitioner reported that his "pain and ROM ha[d] improved over the past 3 weeks." *Id.* at 37. He added that he "kept his appointment today due to some positions that cause him sharp pain." *Id.* Referencing his earlier right shoulder rotator cuff injury, Petitioner stated that "this pain in the left side feels the same." *Id.* at 38.

- The orthopedist observed no tenderness or pain with palpitation but limited ROM. Exhibit 3 at 39-40. And x-rays taken that day revealed only "moderate degenerative acromioclavicular narrowing." *Id.* at 40. After discussing the

options of formal PT vs. a home exercise program ("HEP") and the possibility of an MRI, the orthopedist provided Petitioner with a HEP.

- Petitioner was next seen by his PCP more than one month later, on April 22, 2021, for an annual physical. Exhibit 6 at 4-6. It was noted that Petitioner had received the first dose of the Moderna COVID-19 vaccine the previous day. *Id.* at 5. There is no mention of left shoulder pain in the medical record from this visit. *Id.* at 4-6; *see also* Exhibit 9 at 31-33 (report of visit provided four days later). The PCP discussed the importance of a healthy diet and exercise and ordered routine bloodwork. *Id.* at 5-6.

- On June 4, 2021, Petitioner visited his PCP, complaining of hives, itching, and burning that comes and goes, started on his legs, and spread to other areas. Exhibit 9 at 15. The PCP diagnosed him with contact dermatitis and eczema and prescribed a topical cream and prednisone. *Id.* at 14, 16.

- Almost two months later, on July 30, 2021, Petitioner sought treatment for his hives from a dermatologist. Exhibit 10 at 8-10. He reported that the hives started around Memorial Day - two to three weeks after he received the second dose of Moderna COVID vaccine - and were suppressed with antihistamine therapy. *Id.* at 9. After viewing Petitioner's photographs, the dermatologist confirmed the existence of hives and discussed the possible etiology. He instructed Petitioner to gradually taper the antihistamine dosage until the hives returned, then increase the dose again to the minimum effective dosage. *Id.*

- Although the medical record from this July 2021 dermatology visit lists left shoulder pain under "Problem List", there is no mention of any ongoing left shoulder symptoms. Exhibit 10 at 8. This entry characterizes the problem as "not chronic." *Id.*

- On November 15, 2021, Petitioner returned to his PCP for the continued, albeit intermittent, occurrence of hives. Exhibit 9 at 11. He also described swelling of his lips after drinking beer which he believed may be connect to medication he was taking. His PCP recommended Petitioner avoid such triggering behavior and consult an allergist. *Id.* The medical record from this visit includes an entry showing Petitioner received COVID vaccines on April 20 and May 1, 2021. *Id.* at 10.

- On May 3, 2022, Petitioner visited an allergist for treatment of his hives. Exhibit 11 at 2-3. Providing the same onset description, he reported that his

symptoms had improved. *Id.* Noting that this reaction (hives) was described in literature, the allergist diagnosed Petitioner with a vaccine reaction. He recommended Petitioner delay his next booster and load up on antihistamines prior to and after vaccination. *Id.* at 3.

- Signed on February 27, 2021, Petitioner's first declaration addressed a basic Vaccine Act requirement - that no prior civil action had been filed. Exhibit 8.

- In his second declaration, signed on December 28, 2021, Petitioner described soreness upon vaccination that worsened after the first few days. Exhibit 7 at ¶¶ 2-3. After approximately one week, the pain grew sharper, and his ROM became limited. *Id.* at ¶ 3. And Petitioner again reiterated that his pain was similar to the pain he experienced previously after his right shoulder rotator cuff tear. *Id.* at ¶ 1.

- To explain the limited medical treatment he received, Petitioner represented that he generally avoided seeking medical care, thought he was experiencing a muscle injury, was managing his pain, and was actively avoiding potential exposure during the worldwide COVID Pandemic. Exhibit 7 at ¶ 6. Petitioner added that he chose not to participate in in-person PT due to the cost and his desire to avoid COVID exposure – particularly due to his concern for his young children. *Id.* at ¶ 8.

- Regarding the duration of his symptoms, Petitioner insisted that he continued to experience pain in his left shoulder when he visited his PCP in April 2021, but did not discuss his left shoulder pain because he had seen the orthopedist for treatment only one month prior, understood his injury and treatment, and was dedicated to performing his HEP. Exhibit 7 at ¶ 9. He also asserted that "the focus of the visit was [his] overall health as [he] approached forty and remaining safe during the COVID-19 pandemic, including receiving the vaccine." *Id.* He further insisted that he "was sure to have the doses [of COVID vaccines] administered to [his] right shoulder to avoid any reinjuring or reaggravating of [his] left shoulder." *Id.* at ¶ 10.

- Describing the current condition of his left shoulder in late December 2021, Petitioner stated that his "left shoulder feels healthy, functional, and pain free." Exhibit 7 at ¶ 11.

- In his third declaration, signed on July 12, 2022, Petitioner acknowledged that his left shoulder condition was greatly improved by December 2021,

but claimed that he continued to experience some symptoms of his alleged SIRVA injury. Exhibit 12 at ¶¶ 1-6. He also reiterated his explanation for the lack of any mention of left shoulder pain in the medical records from his April 2021 annual physical. *Id.* at 7. And Petitioner emphasized the distraction provided by the hives he experienced beginning in May 2021. *Id.* at ¶ 8.

- In her declaration, signed on July 13, 2022, Petitioner's former wife (from whom he has since been divorced) recalled him complaining of soreness, which failed to abate, following his receipt of the flu vaccine and pain when lifting heavy objects or raising his arm overhead. Exhibit 13 at 2-3. Citing Petitioner's stubbornness, she reported that he was reluctant to seek medical care despite her suggestions that he do so. *Id.* at 4.

- Petitioner's ex-wife insisted Petitioner "continued to have limited functionality of his left shoulder and arm well into 2021." Exhibit 13 at ¶ 5. She recalled having to shorten kayak and paddleboarding trips during the summer of 2021 due to Petitioner's symptoms. *Id.* at ¶ 7. She remembered that Petitioner "was very regimented" regarding the performance of his physical therapy exercises, allowing time in the morning and evenings to complete his HEP. *Id.* at ¶ 9.

### 1. *Pain Onset*

The record as a whole supports Petitioner's description of left shoulder pain beginning around the time of vaccination. When seeking treatment from his PCP and orthopedist, Petitioner attributed his left shoulder pain to the flu vaccine he received a few months earlier, stating that his pain had begun around that time. Exhibit 2 at 13; Exhibit 3 at 37. Although only a few such general statements exist, due in part to the limited treatment pursued by Petitioner, there is a dearth of medical record evidence supporting a later pain onset.

While these entries were based upon information provided by Petitioner, they still should be afforded greater weight than more current representations, as they were uttered contemporaneously with Petitioner's injury for the purposes of obtaining medical care. The Federal Circuit has stated that "[m]edical records, in general, warrant consideration as trustworthy evidence . . . [as they] contain information supplied <u>to</u> or by health professionals to facilitate diagnosis and treatment of medical conditions." *Cucuras*, 993 F.2d at 1528 (emphasis added). Information provided by Petitioner to a treater and contained in a contemporaneous record deserves weight, and should not be considered subjective merely because it *came* from a patient, rather than physician.

In addition, the lack of an assertion of *immediate* pain is not lethal to Petitioner's claim because only pain within 48 hours of vaccination is required. In his second signed declaration, Petitioner described soreness in the first couple of days that did not resolve. Exhibit 7 at 2. This imprecise description still supports an onset within 48 hours.

Although Petitioner delayed seeking treatment for almost three months, that delay does not provide the strong evidence that Respondent contends. It is common for SIRVA claimants to delay treatment, thinking his/her injury will resolve on its own. Additionally, Petitioner was not seen during this 79-day period for any other illness or medical condition. Such intervening treatment evidence can in many cases either corroborate a petitioner's claim or undermine it – but it is totally absent here.

Accordingly, I find there is preponderant evidence to establish the onset of Petitioner's pain occurred within 48 hours of vaccination.

### 2. *Severity*

To satisfy the Vaccine Act's severity requirement in this case, Petitioner must show that he suffered symptoms of his alleged SIRVA beyond March 23, 2021 (assuming an onset within 48 hours of the September 22, 2020 vaccination – which I have found the record preponderantly supports). The above medical entries preponderantly suggest Petitioner suffered from pain, primarily with certain movement and positioning, at least several weeks after the orthopedic appointment on March 11, 2021 - thus satisfying that severity requirement.

Although Petitioner sought treatment on only three occasions, he has provided an adequate explanation for his lack of care from vaccination through at least April 21, 2021, when he received his first COVID vaccine – the desire to avoid exposing himself and his family (that included his two small children) to this illness. Until his December 2020 visit for his left shoulder pain, Petitioner had not visited his PCP since April 2019. *See* Exhibit 2 at 27-30. And when seeking treatment for his left shoulder pain, Petitioner did not pursue treatment for any other condition. He did not undergo an annual physical until the day after receiving the COVID vaccine, April 22, 2021. *Id.* at 5.

Most importantly, Petitioner's injury had improved, but not resolved, by his orthopedic appointment on March 11th, less than two weeks before the six-month mark. Exhibit 3 at 37-40. At that visit, the orthopedist obtained x-rays, discussed treatment options that included formal PT and an MRI, and observed limitations in Petitioner's ROM upon examination. *Id.* at 37, 39-40. Petitioner's election to rely on a HEP program does not negate the fact the orthopedist believed a referral for in-person PT was warranted, and an MRI may be needed.

Furthermore, given the lingering effects of the worldwide COVID Pandemic and still limited access to COVID vaccines,[5] Petitioner's choice to rely on a HEP instead of in-person PT does not provide the usual evidence of symptom mildness. It is understandable that Petitioner would make this choice even when experiencing more moderate symptoms.

Petitioner also provides a credible explanation for his failure to mention any ongoing left shoulder symptoms at his annual physical on April 22, 2021. Exhibit 7 at ¶ 9. Having received treatment and a HEP from an orthopedist approximately one month earlier, it was not unreasonable for Petitioner to omit mention his current left shoulder condition, since he likely expected his individual self-treatment would prove sufficient.

In *Kirby*, the Federal Circuit explained that its holding in *Cucuras* was limited to "the unremarkable proposition that it is not erroneous to give greater weight to contemporaneous medical records than to later, contradictory testimony," but that this principle should not be interpreted as a finding that "the medical records are presumptively accurate and complete, . . . that when a person is ill, he reports all of his problems to his doctor, who then faithfully records everything he is told." *Kirby,* 997 F.3d at 1382-83. In that case, the Circuit determined that the special master's finding of six-month sequela was not arbitrary or capricious, despite the lack of recorded symptoms and the *Kirby* petitioner's general statements of feeling fine or having no complaint. *Id.* at 1383.

Furthermore, Petitioner is not required to establish that he was still experiencing symptoms related to his alleged SIRVA at his April 2021 physical, but rather only through March 24, 2021. And the addition of only an HEP supports the premise that Petitioner would not have experienced a full symptom resolution in less than two weeks thereafter. Had Petitioner received other treatment, such as a steroid injection, he may have obtained such accelerated relief - but no injection was administered in this case.

Although Petitioner's overall limited medical care course suggests a lower pain and suffering award will be proper in calculating damages, it does *not* mean I cannot find the basic requirement of six months severity met. And I find Petitioner has provided a credible explanation for his choice to seek minimal treatment, and to rely primarily upon oral steroids, over the counter pain medication and an HEP, until late April 2021. Accordingly, there is preponderant evidence to establish Petitioner suffered the residual effects of his alleged SIRVA for more than six months.

[5] *See* https://www.cdc.gov/museum/timeline/covid19.html (last visited Apr. 15, 2024) (For a timeline related to the pandemic and availability of COVID vaccines).

### III.    Additional Requirements for Entitlement

#### A.    Legal Standards

In addition to requirements concerning the vaccination received, the pain onset and duration of petitioner's injury (discussed above in Section II), and the lack of other award or settlement,[6] a petitioner must establish that she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying Qualifications and Aids to Interpretation ("QAI") are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:
>
> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged

---

[6] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of his injury for more than six months, died from his injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury. *See* Section 11(c)(1)(A)(B)(D)(E).

signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10) (2017).

### B.    Analysis

Respondent has stated no further objections to compensation, and I find Petitioner has otherwise satisfied all criteria for a Table SIRVA injury following receipt of the flu vaccine. There is no evidence of prior left shoulder pain, inflammation, or dysfunction or an alternative cause for Petitioner's symptoms. *See* 42 C.F.R. § 100.3(c)(10)(i), (iv) (first and fourth QAI criteria). And Petitioner exhibited pain and limitations in ROM solely in his left, injured shoulder. *E.g.,* Exhibit 2 at 13 (first report of pain in December 2020); Exhibit 3 at 38 (orthopedic appointment in March 2021); *see* 42 C.F.R. § 100.3(c)(10)(iii) (third QAI criterion).

As I have determined in this ruling, the record supports a finding that Petitioner suffered pain within 48 hours of vaccination and the residual effects of his SIRVA for more than six months. *See supra* Section XIV.B.; 42 C.F.R. § 100.3(c)(10)(ii) (second QAI criterion); Section 11(c)(1)(D)(i) (the Vaccine Act's six-month severity requirement). Additionally, the vaccine record shows Petitioner received the flu vaccine at a Rite Aid Pharmacy in New Hampshire. Exhibit 1 at 3; *see* Section 11(c)(1)(A) (requiring receipt of a covered vaccine); Section 11(c)(1)(B)(i) (requiring administration within the United States or its territories). And there is no evidence that Petitioner has collected a civil award for his injury. *See* Section 11(c)(1)(E) (lack of prior civil award). Thus, Petitioner has satisfied all requirements for entitlement under the Vaccine Act.

## IV.    Appropriate Amount of Compensation

Although I have found Petitioner entitled to compensation, I do not expect the amount awarded for Petitioner's past pain and suffering to be great. According to

Petitioner and his ex-wife, Mr. Sullivan continued to engage in activities such as kayaking, paddleboarding, and playing catch with his son, albeit in a more limited manner. Exhibit 7 at ¶ 3; Exhibit 12 at ¶¶ 5-6; Exhibit 13 at ¶ 7. When Petitioner played catch with his son approximately one-week post-vaccination, he experienced a sharp pain only when lifting his left arm overhead in an arching motion. Exhibit 7 at ¶ 3. And the symptoms he reported at medical appointments were not severe. Exhibit 2 at 10 (stating his pain was not debilitating); Exhibit 3 at 37 (stating he had experienced improvement and considered not canceling his appointment).

By Petitioner's own admission, his left shoulder was "healthy, functional, and pain free" by late December 2021. Exhibit 7 at ¶ 11. Even crediting the assertion of his ex-wife – that Petitioner faithfully performed his home exercises, Petitioner's condition resolved with little treatment. *See* Exhibit 13 at ¶ 9.

In his most recent declaration, signed in July 2022, Petitioner claims that his symptoms continued beyond the end of 2021. However, he must provide additional evidence, currently lacking in the record, to support this longer duration. Similarly, there is a little evidence supporting symptoms sequela beyond April 2021. At a minimum, Petitioner should provide the vaccine records from the COVID vaccines he received, confirming that they were administered in his right arm as alleged. *See* Exhibit 7 at ¶ 9. But Petitioner should otherwise not expect a substantial pain and suffering award, given the overall preponderance of evidence on this issue.

## Conclusion

**Based on the entire record in this case, I find that Petitioner has provided preponderant evidence satisfying all requirements for a Table SIRVA and the Vaccine Act's severity requirement needed for both Table and non-Table claims. Petitioner is entitled to compensation in this case.**

**IT IS SO ORDERED.**

<u>**s/Brian H. Corcoran**</u>
Brian H. Corcoran
Chief Special Master